IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 3, 2018

**IN RE MACK E., ET AL.**

**Appeal from the Juvenile Court for Jefferson County**
**No. 17-00047     Dennis Will Roach, II, Judge**

_____

**No. E2017-01337-COA-R3-PT**

_____

Barbara E. ("Mother") appeals the termination of her parental rights to the minor children Mack E., Hannah E., Amber E., Donnica B. and Barbara Jean B. (collectively "the Children"). Donald B. ("Father") appeals the termination of his parental rights to the minor children Donnica B. and Barbara Jean B. We find and hold that the State of Tennessee Department of Children's Services ("DCS") proved by clear and convincing evidence that grounds existed pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1), (g)(2), and (g)(3) to terminate both Mother's and Father's parental rights and that it was proven by clear and convincing evidence that the termination of both Mother's and Father's parental rights was in the Children's best interests. We, therefore, affirm the June 28, 2017 order of the Juvenile Court for Jefferson County ("the Juvenile Court") terminating Mother's and Father's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and J. STEVEN STAFFORD, P.J., W.S., joined.

Garry L. Chin, Knoxville, Tennessee, for the appellant, Barbara E.

Brett J. Bell, Dandridge, Tennessee, for the appellant, Donald B.

Herbert H. Slatery, III, Attorney General and Reporter; and Erin A. Shackelford, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

W. Keith Repass, Dandridge, Tennessee, Guardian ad Litem.

## OPINION

## Background

The Children were taken into State custody in April of 2014 due, in large part, to environmental concerns, and were placed in a foster home and found to be dependent and neglected. A trial home visit with Mother and Father was attempted from June to July of 2015, but was disrupted. DCS filed a petition in January of 2016 seeking to terminate the parental rights of Mother, Father, and Robin E., the biological father of the three eldest of the Children.[1] After a trial in June of 2016, the Juvenile Court terminated Robin E.'s parental rights, but found that no grounds for terminating Father's parental rights had been proven and that although DCS had proven abandonment by willfull failure to provide support as to Mother, that it was not in the Children's best interests for Mother's rights to be terminated at that time.

A second trial home placement with Mother and Father was attempted after the June 2016 trial, but was disrupted in September of 2016. In January of 2017, DCS filed another petition seeking to terminate Mother's and Father's parental rights to the Children. The case proceeded to trial over multiple days in May and June of 2017.

At trial, Stacy Weaver, who works with Freewill Baptist Family Ministries, testified. Ms. Weaver stated that she "would visit the children on a weekly basis, checking on their well-being," and that she had done so for a little over a year. During the last trial home placement, Ms. Weaver visited the home twice a week. Ms. Weaver explained that: "at some point [she] was moved to residential for a few weeks, and Teri Slone (phonetic), [her current] supervisor took over on some of those visits, but then [Ms. Weaver] was back on the case in September again. So it was, like, a split time between Teri and [Ms. Weaver]."

Ms. Weaver testified that there were times during her visits when Mack, the oldest of the Children, was not at home because he had walked to someone else's house. Ms. Weaver stated that during those times, Hannah "would usually be home alone. And Amber would take off and go somewhere in the neighborhood to another friends [sic] house. She was not being supervised. Amber liked it because she said there were no rules, and she got to do what she wanted." At that time Amber was 11 years old. Ms. Weaver stated:

---

[1] Robin E. is not involved in this appeal.

And then Hannah would be left at home to be alone, and I know she was afraid to be home alone. She had told me she was, but sometimes she would be there by herself late at night; nothing to eat. She didn't like to try to find - - hadn't really been taught how to cook or shown what to cook, or there was nothing left for her to be able to heat up. She said the food that was left in the refrigerator - - and she showed it to me. She lifted the containers out of the refrigerator. They were styrofoam containers from Dixie Stampede full of leftovers. But she would pull them out and show them to me, and there was mold growing across the top of some of the food and roaches scurrying from the containers as soon as she lifted the lid off.

So I advised her at that time to throw them away. And so we stood there with the trash bag and threw the molded and bug-infested food in the trash.

Ms. Weaver was shown photographs, which she stated that she took in September shortly before the disruption of the last trial home placement. She explained:

These look like the pictures that I took in September, I believe it was, showing a bottle of chemical. I don't know what it was, but it was in the little girl's bedroom sitting on the floor beside of their dresser. And it concerned me because it wasn't put up or locked out of their safety, but it was on the floor where the little girls could get to it.

These were roaches along the ceiling, hiding in the corners of the ceiling.

This is Mack's room and that's his xbox, and the roaches were going in and out of the xbox.

This is the family's oven. I opened the door and wasn't able to get a picture of it because they moved so fast, but when I opened the door, there was a pile of roaches on the door that I thought at first was a swarm of bees. It was that big of a bundle of roaches. I immediately let the door go and screamed.

Mack was laughing at me. When I opened it again to take a picture, there was still roaches along the side of the oven. And they can be seen there in those pictures.

3

This one was taken – that's also the oven, and the roaches that were crawling around through the oven.

This was a tote bag that was sitting on the kitchen table, and the roaches were going in and out of the tote bag. It had toys in it.

This was the oven door and the cupboard with the roaches crawling in and out of the food cupboard and the filth that was all along the counter.

That was of me trying to open the door without getting a roach on me, but it was standing there staring at me.

These were in the microwave. These were live roaches in the microwave. And this is their food cupboard and that was a can of salmon. I mean, there was just some odds-and-ends foods that the kids wouldn't eat. But the roaches were crawling across the cans of food.

This was directly on the stove, the roaches feeding on what looked like left-over egg or something. Roaches on the back of the stove. Roaches on the bread package and getting into the plastic, and crawling around the child's toy.

And these pictures are of Barbara Jean, the little one. These are of the sores that covered her legs. And she would sit and pick at them, because they itched so bad, and they covered, you know, both legs.

And I believe this was Donnica. And those were the sores that were on her legs as well, but those sores continued on up to the tops of her leg and onto her little bottom. And they were -- it took quite a while to get those treated.

Ms. Weaver explained that the two youngest of the Children, Donnica and Barbara Jean, usually were not in the home when Ms. Weaver visited. She stated:

There was one time I went, and they were on the floor asleep. They did not sleep in their beds. They slept on the living room floor.

I remember this because during this visit I was horrified by the roaches that were crawling around on the floor by the children. And I was

4

over there trying to stomp and kill the bugs before they crawled across the babies that were sleeping on the floor.

Ms. Weaver testified further about the condition of the home and stated:

Pets were an ongoing issue due to the unclean home. There was piles of dog food stuck to the carpet. Some of it was molded so it had been there for a little while.

There was a very strong urine smell in the home that you could actually smell before you even got through the door. You could smell it outside the odor was just so overwhelming, and I believed it was not healthy for the children to be in that type of environment with their -- with the breathing. There were hairballs from the pets on the children's beds. The dogs were infested with fleas, and they also had cats in the house.

Ms. Weaver stated that she believed that Mother and Father may have gotten rid of some of the animals, but stated that they still had cats in the house and had 40 or 50 pound bags of cat food and "always a bowl out with food in it. Even though we didn't actually always see the animals, there was food and evidence of those animals there." Ms. Weaver testified that Mother and Father then got another dog, which now lives with them.

Ms. Weaver testified that there were issues with the Children's hygiene. She stated: "The children did not have any supervision so their hair was not brushed. Their teeth were not brushed. Their clothes were dirty or they would wear clothes that weren't theirs because they couldn't find anything clean. They went to school this way."

Ms. Weaver visited the home one time after the last trial home placement disrupted. This visit occurred in early April of 2017. Ms. Weaver testified about the visit and stated:

Not a lot had changed. Again, as you approached the door, you can smell the odor. The outside of the home is littered with trash and broken glass so there's no safe place for the kids to play. There's like old metal and just scrap. I remember seeing broken lightbulbs and things like that leading up to the house.

And once you get inside the smell is overwhelming. I don't know if they had just fumigated because they knew we were coming, but there was a very intense smell. It was kind of an odd smell. But you could also pick

5

up the smell of mold. You could smell urine, feces from the pets. And then it was almost like a sickening flower smell because in every room of that house was a wax warner with the smells different -- I mean, it was just overwhelming. It made it difficult to breathe in the home.

A lot of the clutter had been pushed back to open up the floor. The dead bugs were everywhere. So that's why I suspected they had just fumigated, because no one had bothered to clean them up. They were all along the floors, all along the baseboard trim in the doorways, laying on -- dead bugs on the kitchen counter and on the tables and along the TV. I mean, everywhere you looked there were dead bugs.

In addition to that there were still some survivors, some live bugs coming out by the door in the kitchen. There was still some surviving roaches that were coming out. They looked like very young ones, babies.

In the bedrooms I remember it looked like large, giant leaf bags, the large white trash bags, stuffed into the closets tight as they could get them, stuffed clear to the top of the closets. We asked what was in the bags, and they said clothes and stuffed animals. So they had just stuffed everything in closets and pushed the doors shut. Some of the doors were not able to be closed. They were bulging.

The children's beds -- I went in and pulled back the blankets and found dead roaches in the beds, dead spiders, some little hairballs from the dog that had dog poop stuff in them, just spiderwebs all around the bedrooms in the corners in the rooms. Dead spiders everywhere.

And then again some surviving roaches would be coming out underneath the furniture or out of closets. The house was kept very dark. We had to ask for the lights to be turned on. Even with the lights on it was still difficult to see, because it's so very dark in there.

There was about I would say at least eight roach hotels on the kitchen counter alone, and they were placed near food to draw them in I guess. I looked in the refrigerator, and there were still remains of dead bugs and their droppings in the refrigerator.

Ms. Weaver testified about the conditions prior to the disruption of the last trial home placement and stated:

6

I was there and saw what they had to cook with my own eyes and helped Hannah come up with a meal because they were so hungry.

But Hannah was the one that was usually left to try to find something for her and Amber. The two little ones were not there so she didn't have to feed them. And Mack would go off and find something on his own at a friend's house.

But she would -- a lot of times they would eat snacks. They would eat chips or snack cakes or something like that, because there wasn't a lot of food that they could cook. Items in the freezer were big items that a child would not be able to prepare.

In the cupboards there was -- like we saw in the picture earlier. It was like cans of salmon. There was cranberry sauce. There would be like a can of corn, just odds and ends of things that Hannah said mama had picked them up from the food pantry. So it was a lot of unusual items. I think there was even coconut milk in there.

Ms. Weaver described helping Hannah cook a meal during one of her visits to the home and stated:

I had - - I taught her - - you know, as we pulled the dishes out - - the pans out to cook the food, she had to rewash them because there were roaches in the pans. So she stood there and washed them, and I dried them. She would take out a spoon, and we had to flick the roaches off of the spoon and wash those.

We found a package of pasta in the refrigerator that had not been opened. So we got that and we boiled that. She didn't know how to - - what to do with it or anything so I was showing her how to fix that. We found a small can of spaghetti sauce in the cupboard and a can of corn. So I showed her how to open those cans and how to season them. And we still had to wash more dishes before we could put any food into them.

As the food was cooking on the stove, the steam and the smell of the food was going through the stove in the kitchen, and it was drawing in the roaches. And so I was standing there at the stove, trying to protect the food. The roaches were hanging off of the stove hood waiting to drop into the food. And I would say there was at least a dozen or more roaches

hanging from the stove - - the range hood.  They were on the counter.  They were in the sink.  They were everywhere so - -

Ms. Weaver testified that the Children stated after the last trial home visit was disrupted that they do not want to return to the home.  When asked if the Children missed anything about home, she stated:

Hannah has told me that the one thing that she misses is going to Dollywood with the free passes from Dixie Stampede, and she misses all the visits to Taco Bell all the time.  But she did indicate that once that money is spent then there's nothing left to buy the things that they need more for the family.  So she said that's the only thing that she misses.

Amber said she misses being able to run around through the neighborhood and go where she wants and not having like to -- not having rules.  She could go where she wanted and stay out as late as she wanted because there was no one to keep her at home.

Ms. Weaver also visited Father's mother's house, where the youngest two of the Children, Donnica and Barbara Jean, spent much of their time, and she stated:

There was a time or two when I had to go to grandma's home to see the girls, because I had to see them twice a week.  Actually I was – I've lost track of how many times I've been there, but I did go to grandma's house and see the girls.  And when you walk into the home, you can smell the strong smell of cigarettes.  She stopped when I would come in, and you could see the ashtrays sitting around that were full.  And she's on oxygen.  But that's where Donnica and Barbara Jean were staying.

Ms. Weaver testified that the Children have spoken to her about being verbally abused.  She stated:

Amber, Hannah, and Mack were verbally abused.  Mack said that he knew that -- he had been called names, but he didn't want to talk about it.  He tried to avoid the subject with me, but he said that he had been called names.  He said, "I'm just going to leave it at that."

Hannah said she had been referred to as a bitch and said that -- Amber said that she had been called a jerk and a bitch.  And both girls knew that Mack had been called names, but they would not repeat the

8

words. They said they would get in trouble for even writing those words down. So I guess we have to use our imaginations on that.

Ms. Weaver testified that Hannah had talked to Ms. Weaver and:

She said she felt like she was not trusted at home, that nobody believed her. She said it was a weird kind of love. She said when she's at the [foster] home, that's a special kind of love that's like no love she'd ever felt before.

Ms. Weaver also testified:

Amber said that when she is at home in mama's house, she would often get things thrown at her. Mack was the worst at it. He would throw a hairbrush at her and hit her in the head with tennis balls. He would throw whatever at her, just to make her mad. And Amber stated that mama would just turn her head.

Mack later told me that he knew it was wrong. He was kind of testing things to see what he could get by with. He said he was -- there were no rules, and it seemed like they were letting him get by with everything because they didn't want to make him mad. He said it seemed like if they could keep him happy, he would be able to keep the siblings happy, and everybody would want to stay. So they ignored a lot of the actions that Mack did against Amber. And Amber was the one that was getting hurt.

Ms. Weaver further testified:

[Amber] told me that if she would ever try to talk to mama and mama didn't like what she was saying, she would tell her that she was being rude, or she would be self -- was being selfish. And a lot of times she would whup her.

So she said so that she wouldn't get whupped anymore she quit talking to mama and quit talking about her feelings. But she said when she's in the foster home, [the foster mom] encourages them to talk about things. And they sit on the couch and talk about how they're feeling, and they are supported and given ideas of how to handle various situations and not punished.

9

Ms. Weaver stated that during the last trial home visit prior to its disruption the Children appeared "very much depressed, not feeling good and confident about themselves." She stated: "They were struggling in school. There was no one to sign their papers for them for school; no one to pay their fees; no one to do this or that. And they were wanting to be on basketball teams. They were needing this or that for school," but often they wouldn't see Mother or Father until the weekend.

When asked to describe the Children's morale in the foster home, Ms. Weaver stated:

Very confident. I saw Hannah standing tall and proud in her prom gown, and then her hair is just fixed beautifully. She's been taught how to put on her makeup. She's very confident and very proud of what she's becoming. She is a star basketball player. Her teachers speak very highly of her. She is very clean, always smells good. Her clothes are perfect all the time. She is becoming a beautiful young woman.

Amber -- her grades have turned completely around. She is getting A's. The teacher said that she is just making wonderful progress. She was very pleased with how she was able to come back and just pick up and just turn a phase completely around.

She's developed more of a personality and likes and dislikes and learning about friendships and trusting and creating a bond with the foster parents. She's becoming very confident.

Donnica -- when she was back at home, she was still just like a baby. I mean, it was difficult to understand her. She was overweight. She wasn't doing a whole lot, just not a lot of -- and when she went back to the foster home, she got enrolled in pre-K. And the teachers have said that she's become a leader in the classroom. She is befriending everyone. She looks out for the others in her classroom, almost in a motherly style, looks out for the underdog and is taking charge.

She is getting caught up in her curriculum as far as what she had missed earlier in the year until the time she was able to enter pre-K. And she made up that difference. She's smart.

Barbara Jean is still learning to control her temper, but she's still a baby and has a long ways to go. But I noticed that her speech is improving,

10

and she's becoming more open and more talkative and seems to be confident in herself.

Mack is the one that we have seen a huge change in. Mack has taken some pride in himself. He's a clean-cut young man and is passing all of his grades -- or all of his classes and has actually signed up with a recruiter for the U.S. Air Force and is talking about a career in the Air Force.

Ms. Weaver testified that she does not believe it is in the Children's best interests to return to Mother and Father. She testified that Mack, Hannah, and Amber have expressed that they don't want to go home, and that Donnica and Barbara Jean are too little to be asked about their preference.

Karen Hudson, a family services worker with DCS, testified that she was assigned to the Children's case in March of 2016. Ms. Hudson visited the home during the last trial home placement and observed:

the children increasingly looking more despondent, more disheveled, dirty, mismatched, ill-fitting clothing.

And on 8/19 I found the lice in Amber's hair. I went to visit her at school, and her hair was just a mess. And I said - - I offered to help fix it, and we went outside. And I took her hair out of the little ponytail, and she had on a white hoodie and lice fell into the white hoodie.

Ms. Hudson stated that just prior to the disruption of the trial home placement, she met individually with Mack, Hannah, and Amber and each stated that they wanted to go back to the foster home. Ms. Hudson stated:

They said that there was just nothing to eat. They said the parents got food stamps, and when they would get them, they would get a whole bunch of food, mostly junk food. They'd eat it up within a day or two and then not have anything to eat. Hannah talked about flicking roaches off the food as she was eating it and getting used to doing that.

The parents were never home. They said they might see them on the weekends but that they got home so late the kids were at school in the morning. The parents would be sleeping in. And they got home as they said two or three in the morning. So they didn't see them most nights unless they stayed up that late.

11

Ms. Hudson was asked about what efforts DCS has made to assist Mother and Father, and she testified:

> This family has received homemaker services, therapeutic visitation, counseling, domestic violence counseling, additional counseling. And we allow our families to get services for six months. After that it requires our R.A. approval.
>
> And, let's see, I think the homemaker services went to nine months. So that's three over the norm. Counseling went to seven I believe, and I think the therapeutic visitation also was at seven months.

She clarified that the domestic violence counseling was "called anger management" and went for five months only.

Ms. Hudson was asked about Mother's and Father's reasons for the condition of the home, and she stated:

> They tended to blame the people upstairs, but having reviewed the case notes again, it seems almost cyclical in that the infestation of the lice and the roaches would ebb a little bit, and then it comes back. They don't seem to be able to sustain any sort of change, and according to the psychologicals, they don't appear to be motivated to do so. . . . I would agree with that assessment that - - well, the fact of the matter is they said at this last [child and family team meeting] they don't think there's a problem. They don't see a problem. So if there's not a problem recognized, then how are you going to fix it.

Ms. Hudson and her supervisor attempted to visit the home on May 8, 2017, and although both vehicles were in the yard, no one answered the door. Ms. Hudson stated:

> One of my main concerns was my inability to have access to the home to check the status - - the current environmental status. And [Father] said that he went to work at six a.m. seven days a week, that he returned at two or three a.m. seven days a week. And he said that the only time we could come was at three a.m. I said, "Okay. Give me a day." Then he did not give me a day.
>
> We went out to - - [Mother's attorney] intervened and recommended that [Mother] call - - you know, to arrange to have time off or do whatever

she needs to do to permit DCS to be able to look at the home. And so we agreed that she was going to call within seven days and set up a time that I could come out and inspect the home, and that didn't happen.

Ms. Hudson did not know why Mother and Father would not provide a date. She stated that she had tried to do unannounced visits and had been unable to do so, and so she tried to do a scheduled visit, but she was unsuccessful.

Ms. Hudson testified that the action steps in the permanency plan created for the Children included tasks for Mother and Father such as maintain a home that is insect free, have no pets in the home, have stable housing, reliable transportation and working utilities, see to the health and well-being of the Children, and follow the recommendations of the psychological examinations. Ms. Hudson believes that the most important of those tasks was to have a suitable living environment free from insects because that has been a persistent problem.

Ms. Hudson agreed that Mother and Father have complied with maintaining employment and obtaining a vehicle, although at times they drove illegally when Father drove without a license. Mother and Father, however, have failed to clean up the clutter in the home and have failed to eliminate the infestation of lice, roaches, and fleas. Ms. Hudson testified that these tasks were reasonably related to remedying the conditions that led to foster care. Ms. Hudson stated that the reason for foster care was the unsafe living environment in Mother's and Father's home. Ms. Hudson testified that the conditions that led to removal of the Children still persist. She also testified:

I'd just point out that we do case services for those -- you know, we did an initial clothing allotment. But after the disruption in 2015 when they went to the foster home, then the case notes say that the mother was too embarrassed to bring the clothing that the kids had to the children -- this is after 32 days of being on trial home pass -- because they were soaked in cat urine and couldn't get the smell out.

When they went to -- when the disruption happened in September 2016, the clothes in that 79 days that they were home were in such disrepair, whether it was staining or rips, infestation -- you know, there was bugs crawling out of the bags of clothing that were brought. So we had to do another case services and get the kids another clothing allotment. It's just concerning that in that short of period of time that all of their clothing is completely destroyed.

13

Ms. Hudson does not believe that Mother and Father are going to remedy the conditions that led to foster care. When asked if in her opinion continuing the parent/child relationship diminished the Children's chances of being placed in a safe, stable, permanent home, Ms. Hudson stated:

> In my opinion, yes. . . . Watching the children when they were placed back home, each time I visited, just them getting more and more as I said before, disheveled, dirty, looking just despondent; and then when they were put back into the foster home - - okay. One incident that really just kind of shook me was the two youngest girls. They always looked afraid of me before this, but when they were placed back in the foster home after the disruption, when I went to go see them for the first time, they both ran to me and hugged me. That was - - you know, you can draw whatever you want inference from that.

> But watching them as they've been placed back this time, watching them get healthier each month when I go up there and looking happier and more self-confident and well-groomed and just holding their head higher and looking confident - - it's hard to describe.

Ms. Hudson visited Father's mother's home on the day of the disruption to remove Donnica and Barbara Jean, and she also visited it on one other day. Ms. Hudson stated:

> Ms. Stacy said she did note, you know, a very strong cigarette odor, ashtrays overflowing. She had an oxygen tank so she was still smoking, and she needed assistance from - - I think the niece - - I'm not sure what relationship the adult girl was that was in the home, but she had to take her by the arm and help her get up off the couch.

When asked if she thought that Father and Mother were taking the matter seriously, Ms. Hudson stated:

> I don't think so. Particularly with [Father's] response at the last [child and family team meeting] and his cavalier attitude of, you know, "How does that sound, Ms. Karen, to come at three a.m. in the morning?" I said, "Okay. Let's do that." And he still wouldn't give me a day. And his saying, you know, that they work -- you know, have to get up at six to be at a show that doesn't start until three o'clock, 3:30, in the afternoon is just kind of ridiculous.

14

Ms. Hudson testified that although Father's driver's license was suspended in December of 2015, Father kept telling DCS that it was lying around the house somewhere and that he just could not find it.

Ms. Hudson stated that the older three Children reported that even on days when Mother and Father were not working they "were still up in Pigeon Forge and weren't coming home or spending time with them." Ms. Hudson was asked if Mack and Hannah want to see Mother, and she testified:

> Hannah and Mack have said no, they don't want to see their mother. They want to be adopted. They've been clear about that. Mack said he went on one visit this spring, and Hannah went on one visit this spring, because the parents had been giving $20 for each child at each visit. And they felt like they should thank them.
>
> And I asked Mack, "well, how did the visit go?" He said, "well, it's just made me realize just how much my mom is not going to change, and she's not going to ever leave [Father]."

Ms. Hudson believes that removing the Children from the foster home would have a detrimental effect. She stated: "They have been in this home since July of 2014, and that's a long time in a child's life. And I think that they're doing well there. They're flourishing. They're attached."

Ms. Hudson was questioned about the bug problem in Mother's and Father's home, and she stated:

> It is a bad problem, but I talked to one exterminator who had exterminated at their house before, and he said that because of all the stuff - - all the clutter in the house that it would do no good to spray because it's not going to permeate all the stuff.

Kristi S. ("Foster Mom"), the Children's foster mother, testified at trial. Foster Mom has lived in her current home for almost four years. Foster Mom and her husband both have stable income and work 40 hours per week. The Children initially were placed in Foster Mom's home in July of 2014, and left the foster home only twice for trial home placements.

The last time the Children returned to the foster home was in September of 2016. Foster Mom testified that at that time:

Well, as soon as they came, we got in the shower - - they got in the shower. Their clothes were not in the greatest of condition. And Donnica and Barbara Jean and Amber had lice. And Donnica had sores - - weeping sores probably I would say, if I had to count, eight or nine sores in her head. But they were weeping pussy stuff from them. And Barbara Jean had probably - - I counted 30 or better lice - - live lice - - not nits - - lice on her head. And Donnica probably had 25 at the time. Amber not so many. So she had between 10 and 15 because I didn't do a count on Amber.

But their heads were pretty well ate up. Donnica had sores on her lower back by her buttocks - - I don't know. The doctors said they were bug bites but couldn't tell me what kind of bug bites. And Barbara Jean had sores up her arm. . . . I don't know what those sores were. I just take them to the doctor and got antibiotic cream for them. She said it was possible bug bites, but she couldn't tell me what they were - - what kind of bites.

Foster Mom testified that during the three years that she has had the Children, she has had to treat for lice every time they returned from a weekend stay or trial home visit. She was shown a photograph depicting flea bites on legs, and she stated that this was a common occurrence. Foster Mom stated that after the trial home placements, Donnica and Barbara Jean would return to her home with a runny nose that was "like allergies. It's not infection-type runny nose." Mack and Hannah did not have lice, but Donnica, Barbara Jean, and Amber did. Donnica was wearing "clothes that were way too tight for her."

Foster Mom testified that when the Children came back to her home the last time she left their clothing outside because of an awful smell. She stated that she planned to take the clothing to the laundromat the next day. Foster Mom stated: "I got up at six a.m., didn't go to work, went out there and shook all the stuff. And the roaches came out of the clothes. And the smell on the clothes would have knocked you down."

Foster Mom further testified:

Amber told me that she did not brush her teeth for the 45 days that they were home. She - - Amber needs a lot of help on coordinating and personal hygiene, and she is 12 - - well, yeah, she will be 12. So you have to stay on her to brush her teeth and comb her hair, and to match and not wear clothes that are too tight, showing too much, holey, stained, or whatever. You have to stay on her.

But she told me that that's not the case; when she went home, she wore whatever she wanted to and she - - Hannah said that she never hardly ever took a shower because she couldn't make her because she was always up to the neighbor's house with Mack. Because Hannah and Mack and Amber were there.

Foster Mom was asked what she does to help Amber, and she stated that they have a list of rituals including things such as washing face, brushing hair, and brushing teeth and then every morning and every evening she checks to make sure that Amber has done these things. Amber is improving and has learned to put her own hair up in a ponytail. Foster Mom stated: "Well, she likes to go clean. I mean she goes around fixing herself now, and she didn't so . . . ."

Foster Mom testified that when the Children came to the foster home, Amber did not have an Individual Education Plan, and she needed one. The foster parents got her services in school. Amber now gets extra help in math and reading comprehension. Foster Mom testified that Amber was failing, but now is passing and is almost up to grade level. Foster Mom testified about the other children stating that Donnica is going to kindergarten next year and can write her name and knows her ABCs, Hannah is expected to be on the honor roll this semester, Mack is passing all of his classes, and Barbara Jean is starting Boys & Girls Club when school ends so she will be getting some help to allow her to start pre-k next year.

Foster Mom was asked what the Children's reactions were the last time they returned to the foster home, and she stated:

Donnica and Barbara Jean were both asleep, and so I woke up Donnica first. And she woke up and she looked, and she was a little stunned at first. And she finally woke up. She grabbed me and hugged me and then, you know, yelled my name.

Then I put her down. And Barbara Jean was still sleeping so I ran around the car and got Barbara Jean. And she woke up, and she just, you know, hugged me right off the bat. She didn't look stunned, but Donnica did. They both hugged me. And Hannah and Amber and Mack - - they all hugged me and said they loved me, you know, the usual.

Foster Mom explained that when the Children first came to the foster home, Barbara Jean was approximately eight months old. Foster Mom stated: "And I had to put her in walker to make her learn how to walk because she refused to walk. So finally - - it didn't take long either but just maybe three or four weeks she was finally starting to take

steps, but it made her walk." At that time, Donnica was three years old, and Foster Mom stated: "I potty trained her two days after she got to my home." Foster Mom further explained that she potty trained Barbara Jean when Barbara Jean was a year and a half or two years old.

Foster Mom testified that the parents have called her to speak to the Children, but that the parents did not call for six weeks after the last time the trial home placement was disrupted. The parents did not visit the Children during that time period either.

Foster Mom testified that the Children told her about the last trial home placement. She stated:

> Amber is very scared of bugs so - - I mean they petrify her so she said that the roaches were crawling everywhere all the time, on her bed and everywhere, and she was scared that they would get her. So, you know, she couldn't stand them.

> And she said that her and Mack stayed upstairs at the neighbor's house, that a little girl - - Mack and her stayed upstairs because nobody was ever home. It was just her, Mack, and Hannah. And so they stayed up there all the time.

> And Mack and Hannah tried to be her boss, and she just wasn't going allow [sic] them to be her boss. And that there was a guy that stayed in a camper behind their house, and they were scared at night because they didn't know who that was. And they were there until one or two o'clock in the morning.

> Hannah said that she would have to fix food, and the roaches would crawl in and out. And they were in the oven when she had to cook if she got to cook. She also said that they were there by themselves a lot - - Sorry - - and that Mack - - I'm sorry - - that Mack was more of a supervisor for them and that he wasn't very nice because he's a boy.

> She said at one time Mack laid a bruise on her leg, and he never got in trouble, and she told them. So her and Amber made a skit up, and they went in the bedroom. Painted a bruise on her leg - - on Amber's leg, and they were supposed to tell her - - the mom that Hannah did that to Amber to see if Hannah would get in trouble. "Of course," she said, "Amber is not a

18

very good actress," she said, "because Mack never got in trouble." And that they always were lack [sic] with Mack.

And they would stay at the park until dark sometimes, walking home. Nobody ever knew they were at the park because nobody was ever home. That's what Hannah would tell me. Mack, you know, he was 16, 17. So he was old enough. The girls - - and he was okay by himself but the girls weren't - -

Foster Mom testified that she loves the Children and wants to adopt them if they become available for adoption. Foster Mom testified that her husband also loves the Children and wants to adopt them if they become available for adoption. When asked if she loved the Children, Foster Mom stated: "Of course, I do, or I wouldn't be here today." Mack is going to be 18 years old soon. Foster Mom was asked about Mack, and she stated:

Mack has a home. If he wants me to adopt him, I will even though he's going to be 18. Even if he isn't adopted, he can - - that is his home. If he's in school, he's there - - I mean whether he's in school or working or whatever, that's his home. And he knows that. I've told him that several times.

Foster Mom was asked what her long-term vision was for the Children, and she stated: "That they get stable and they can plan their future. They can't plan anything right now." She stated:

They can't do anything right now because they don't know where they're going to be. And they don't know if they go home if they're going to be there for a long time so they can't do anything.

Hannah wants to do sports. Amber wants to do cheerleading. Mack is talking about going into the Navy or the Air Force or something. And they can't make plans because they have no idea what they're going to do. And it's not fair. It was very difficult to - - not just to us but to them as well because we take care of them.

They are well-taken care of, and they're happy. And I've seen them not happy, and I don't like it. I've seen them not taken care of, and I don't like it. And they don't like it. They've told me they don't like it. That's what they've told me.

19

Father testified that he still was involved in a relationship with Mother, and they still lived together. Father was asked about the trial home placement that he was granted after the last trial. He was asked how long the trial home placement lasted, and he stated that he could not remember. When asked how long the placement was supposed to last, Father stated: "Supposed to be with me forever." Father was asked why the placement ended, and he stated: "I could not tell you." He further could not recall any child and family team meetings being held during time of the last trial home placement.

Father stated that he could not recall a meeting on August 16, 2016 at the DCS office in New Market. He was asked if he recalled stating at that meeting that the landlord had been coming in and spraying for bugs, and he stated that he did remember making that statement. Father testified that he would move and has been looking for another home, but has not found a place that will take seven people. Father refused to admit that his current home is not appropriate. Father stated he was looking for another home "Because they say it's not big enough." He also stated: "I can make anything work."

Father was asked about the bugs in the home, and he stated:

> What about the bugs? We have them slowly under control, but the people upstairs that live above us - - we can't do nothing about it if they don't help. . . . Well, we keep spraying. We keep laying out traps and stuff for 'em, but if the people upstairs don't do it, we ain't going to completely get rid of them.

Father testified that he has had conversations with the people upstairs, and he stated that the conversations go "[a]bout the same as usual. . . . I couldn't tell you what they're doing." Father claimed that he knew that the people upstairs had a bug problem because he had seen bugs when he went upstairs to talk to them. Father stated that the people told him they were spraying, but he could not get proof that they were spraying. Father was asked if the landlord was helping, and he stated: "She gives me sprays."

Father testified that he had spent money on lice treatment for the family because: "We had head lice at the time. . . . Most all of us, because usually when one person has it, they all get it." Father could not provide an answer about how long he had head lice. Father admitted that there was a period of time when he could not visit the Children due to the risk of infesting them with head lice, but he could not answer how long that period lasted. He stated: "Every time I went to my doctor I got a clear excuse, saying I was free and clear." Father admitted that the Children had lice the first time they were taken into custody and that they also had lice when the last trial home placement was disrupted.

Father was asked if he recalled a discussion during a child and family team meeting about bugs being everywhere, crawling up walls, on the floor and in the refrigerator, and he admitted that he did. Father was asked if that was in his home, and he stated: "At the time maybe, yes." He testified that was not the case anymore. When asked how long since he got rid of the bugs, Father stated: "It's been awhile since I got rid of 'em. I mean they ain't completely gone, but they ain't crawling like they were."

Father was asked if he recalled a discussion about food not being stored properly, and he insisted that he stored food properly. Father was asked about his agreement to ensure that no open food would be left out, and he stated: "I never said no food could be left out, because that's impossible with kids." When asked why the bugs came into the home, Father stated: "I have no earthly idea. I never asked 'em." Father was questioned further about his statement that the bugs were under control, and he stated: "I ain't got 'em under control. I'm getting rid of 'em." He testified that he was spraying and leaving out bait traps. When asked if he was doing anything else to address the bug problem, Father stated: "Other than burning the house, no. That's about all I can think of other than burning the house."

Father was asked if it was true that he had roaches in the refrigerator, and he stated: "I couldn't tell you. There probably were because the seal was bad on it." He was asked about roaches in the oven, and he stated: "Well, considering that we have cabinets where they can get in cabinets and - - more likely, yeah, they'd be in the oven, too." Father was asked if roaches were in the microwave, and he stated: "Probably because it sits on the counter." Father admitted that he recalled stating that the seal on the refrigerator was messed up and that's why bugs were getting into the fridge. Father was asked if he had fixed that, and he stated that was the landlord's job, not his, and that he reported it to her.

Father admitted that the caseworkers reported that they were bitten by insects while in the home, and that the Children had been bitten by insects in the home. He stated: "Yes, but they also get bit by bugs at the foster care."

When asked if the permanency plan required that he keep the house clean, Father responded that he did keep it clean. When questioned, Father admitted that environmental neglect was why the Children first were taken into custody. When asked why the Children were removed from last trial home visit, Father stated: "I cannot tell you." Father insisted that the house was clean today, but admitted that they still have some roaches. When it was pointed out that the bathtub was in disrepair, Father stated: "That is the landlord's responsibility, sir. . . . And the bathtub - - we can still use it." Father insisted that he told the landlord about the problem with the bathtub, and she had stated that she would get someone to fix it.

21

Father testified that they have a dog. When asked if they have cats, he stated that the cats lived outside. Father admitted that the cats were inside the home "[r]ight before the kids got tooken from us we had 'em in the house, and right before that meeting we had 'em in the house." Father was asked if he remembered a discussion during the child and family team meeting about how they were supposed to get rid of the animals, and he stated: "All the animals are gone except for one." When questioned further Father stated: "The cats are running around outside, but they're not our cats." Father was asked if he remembered agreeing during the meeting that no animal would live in the house and that all dogs would go outside, and he did remember that. Father was asked if he recalled agreeing that the dog would get flea baths, and he stated: "The dog does get flea baths." Father asked if the dog had fleas, and he stated: "Not that I know of. We give him flea baths. He has fleas every once in a while, yes."

Father was asked if he had stated during the child and family team meeting that the Children hated him, and he stated: "Well, all kids hate their parents at some point in time." Father stated that he made this statement after he was told to get rid of the dog and further stated that he refused to get rid of the dog because the Children wanted the dog.

Father was asked if he remembered agreeing that there was a problem with stuffed animals, and he stated: "No." Father testified that he had rid the home of the clutter that lined the rooms and walls as he had agreed. When asked, Father could not recall stating that he had gotten rid of most of the stuffed animals.

Father was asked if he recalled agreeing to ensure that the home was kept clean and neat, and he stated: "And the home is being kept clean and neat." He was asked if it were true that at the time of the child and family team meeting there was a visit to the home and the home smelled of cat urine. He stated: "It might have been. I never smelled it." Father denied burning incense candles to get rid of or mask smells.

Father testified that he could not remember animal feces being on the floor in the girls' bedroom. He admitted that they had some mold in the house and that there still was a very musty damp odor. Father was asked what he was doing to fix that problem, and he stated: "Everything I can, considering that's been again piled on the landlord's responsibility."

Father testified that he was watching the Children "[t]he whole time I was there." Father was asked what childcare plan he had in place for when he was working, and he stated: "They were with my mom or most of the time they were at school." Father stated that he got home from work "about midnight or later." He was asked what the Children did during the evenings, and he stated: "When we was off, [Mother] was there or I was

22

there when I was off." Father was asked if it were true that the Children were being left home alone until about two or three in the morning every night, and he stated: "The older kids, yes." Father was asked why he didn't provide childcare, and he stated: "Well, is Mack not old enough to take care of 'em?" Father then was asked if he was allowing Mack to babysit, and he stated: "He asked for it." Father was asked what Mack knew how to cook, and he stated: "He can cook anything I can." When asked, Father stated that he was not aware of the Children ever saying they weren't being well-taken care of by Mack.

Father testified that Mother got off work around the same time that he did. He was asked if that was midnight, and he stated: "Sometimes yes; sometimes no." Father was asked what the condition of the home was when he came home at night, and he stated that it was "cleaned up other than dirty dishes." He stated that he would wash the dirty dishes "[w]hatever time I came home and there's dirty dishes."

Father was asked if he recalled that the Children's hair was not being combed and their teeth were not being brushed, and he responded: "I was brushing my daughter's hair."

Father was asked if he remembered a child and family team meeting on September 1, 2016, when he called and stated that he was unable to attend because he was at the DMV getting registration for the van. Father could not recall that occasion. He did however, recall going to the DMV to get the registration.

Father remembered being asked to submit a pay stub and his driver's license to DCS. He admitted that he never provided these and stated "because they got my check stubs." With regard to producing his driver's license, Father stated: "I'm still working on getting 'em." When asked, Father agreed that he told the caseworker at the time that it was around the house somewhere. Father was asked why he said this if he didn't have a driver's license, and he stated: "Because they were - - all the information was around the house." When questioned further, Father admitted his driver's license was suspended. Father was asked why his license had been suspended, and he stated: "I could not tell you." He admitted that it had been suspended two times, and he could not tell why. Father was asked about his transportation plan, and he stated that Mother drives and that they have the same work schedules.

Father was asked if he could recall a child and family team meeting on September 22, when possible disruption of the trial home placement was discussed, and he denied remembering the meeting. Father was asked if he could recall a discussion that he and Mother had not complied with the action steps from the previous child and family team meeting, and he stated: "No, sir, because we had done everything they asked."

23

Father could not remember a period of time from September until December of 2016, when he didn't visit or call the Children for six weeks. Father was asked whether if other people testified that this was so they would be lying, and he stated that he was not saying they were lying, but "said not that I remember."

Father was asked what made him think that if the Children were returned to him again the placement wouldn't be disrupted in a few months, and he stated: "Because I'll keep the house clean, like I've been doing now."

Mother testified and insisted that the food was not infested by roaches and that there was not an issue with the Children having adequate food. When asked if there were roaches in the refrigerator, Mother stated: "There was at the time, yes." Mother admitted there were roaches in the oven and the microwave. When asked why she stated that the food was not infested with roaches, Mother stated: "Because we put it in containers like buckets and storage containers."

Mother insisted that she cooked for the Children when she was home. She was asked what kinds of things she cooked, and she stated: "Macaroni and cheese - - all different kind of things. . . . I would fix pizza. I fixed spaghetti. I fixed a lot of things." Mother was asked if the places that she stored the food had roaches, and she stated: "Correct, but I also used containers to put stuff up and to keep bugs out of it." Mother claimed: "There was never roach-infested food in my home," but agreed that they had a roach problem and that there were roaches in the oven, microwave, refrigerator, and freezer. Mother was asked if she had replaced any of these appliances, and she stated: "No, because that's not my job to replace them." When questioned, Mother admitted that they still have roaches, but stated: "Yeah, but not as bad as they were."

Mother admitted that there was a lice issue during the last trial home placement and that lice had been an issue that kept coming back. She also admitted that the house has a very musty, damp odor. Mother testified that she has reported that to the landlord, but that the landlord has done nothing about it. Mother stated that she had reported water leaks, the bathtub, and the problem with the roaches, and the landlord has done nothing. Mother admitted that despite having a problem with roaches on the floor, they were leaving clothing on the floor. She also admitted that there was mold in her daughters' closet. Mother stated that her daughters all share a room. Mother testified that there were water leaks in her son's room, but that Father had taken care of the water leaks last year. Mother was asked if the landlord had begged them to clean up the apartment, and she stated: "And we did from time to time. We were cleaning it up." When questioned, Mother did not know of any mold that remained.

24

Mother was asked if she knew why the Children had been removed from her home, and she stated: "They said it was because of the condition of my house." Mother stated that she did not think there was anything wrong with the condition of her house. She stated: "We've done everything that I think that needs to be done." Mother testified that she did not believe there was anything wrong with the house the last time the Children were removed from her custody.

Mother testified that she would spray and put roach baits down to try to get rid of the bugs. She claimed that she and Father sprayed and put out roach bait every time they got paid, which was every two weeks. She also claimed that she saw a difference doing this. When asked if they still had roaches, Mother stated: "Not as bad as they were then."

Mother claimed that she and Father have not had lice since the Children were removed from their custody. Mother admitted that an action step that she and Father were supposed to complete was for the home to be free of insects including lice.

Mother admitted that she was supposed to call Ms. Hudson within seven days of the child and family team meeting. When asked why she had not done so, Mother stated: "Because it don't do any good."

Mother remembered agreeing to get rid of the pets, and she stated: "Yeah, we got rid of all the cats that we had." She stated they "only have one now." Mother also stated that she did not have a dog, but has since "gained a dog." She stated:

> My friend, Ms. Alice - - she was an older lady, and she - - with her health problems her doctor wanted her to get a smaller dog, and my daughter had asked for it. And normally Hannah don't ask for anything, and I told her yes, she could have her dog.

Mother admitted that this happened after they agreed not to have pets in the home. Mother was asked if it was in Hannah's best interests to get the dog even though they were not supposed to have one, and she stated: "It seemed to be her best interest, 'cause she was really excited about her. And she was doing what she could to take care of her." Mother testified that the dog is an indoor dog. Mother admitted that the Children were allowing other animals into the house including "neighborhood cats and another dog that was running around the neighborhood." She stated that she told the Children not to allow the other animals into the house, but the Children would do so when she wasn't home. Mother insisted that they have gotten rid of all of the animals except for the dog they acquired for Hannah.

25

Mother was asked how long she and Father were not at home, and she stated: "There was a lot of times we wasn't at home, but we wasn't - - it wasn't like we wasn't at home all the time." Mother was asked how many hours she was working per week, and she stated: "[a] lot," and admitted that she worked probably six days a week. Mother testified that she worked at Dixie Stampede. She testified that she would leave for work between 10 and 11 am and depending on the shows would work "anywhere from 11 to two o'clock in the morning before we get out." Mother admitted that generally she worked a 12 hour day, or longer. Mother claimed that she had been working full-time for "[o]ver a year." Mother recalled agreeing to change her work schedule so she could spend more time with the Children and claimed that she had done so.

Mother was asked what the Children would eat when she was working, and she stated: "Food. . . . They can cook about anything they want to cook." Mother was asked if she would be surprised to hear that the Children reported cooking just eggs and hotdogs, and she stated: "No, because that might be the only thing they want to cook. But they know how to cook." Mother admitted that one of the action steps she was supposed to complete was to have an appropriate supply of food in the home. Mother insisted that she had done this.

Mother was asked about the allegation that Donnica and Barbara Jean lived with Father's mother most of the time, and she stated: "It was probably most of the week." She admitted that they ate most of their meals while at Father's mother's house.

Mother claimed that she applied for Section 8 housing and was denied. She stated: "Because they needed other information. I went through background checks. And after I did the background checks, they said I wasn't approved, and there wasn't no reason after that."

Mother agreed that the permanency plan required her to have a psychological evaluation. Mother stated she that she had one, and that she had reviewed the evaluation. Mother was asked what the recommendations of the psychological evaluation were, and she stated: "I wasn't aware of any." Mother has not sought treatment for depression.

Mother was asked if she thought it was in the Children's best interests for her parental rights to be terminated, and she stated: "No, sir." When asked to explain why, she stated: "I don't know how to explain it. . . . I don't know." Mother was asked about the period of time when she did not contact the Children, and she stated: "I did go a long period without talking to my kids because if the foster parents don't want to answer, they don't have to." Mother was asked if she was stating that someone else was at fault, and she stated: "Yes, sir."

Mother admitted that her driver's license was suspended in September. Father's license also was suspended at that time. Mother got her driver's license reinstated. She claimed that she got it "restated before December," but she did not provide proof to DCS until December. Father's driver's license remains suspended. Mother was not sure why Father's driver's license had been suspended.

Two of the Children, Mack and Hannah, testified at trial. Mack testified about the last trial home placement, and stated: "It was roaches everywhere, lack of food - - a lot of stuff happened." Mack stated that on an average day he "came home [from school], watched my sisters, went to bed, woke up, went to school, came home, watched my sisters, went to bed." Mack stated he watched his sisters, Hannah and Amber, five or six days a week. He stated that his mother and Father would go to work at ten o'clock in the morning and not return until two o'clock the next morning. Mack testified that the younger two sisters, Donnica and Barbara Jean, would be at Father's mother's house every afternoon when Father and Mother were working. Mack testified that there were times when he and his sisters didn't see Mother or Father for days at a time.

Mack was asked if there was food in the house to feed himself, and he stated "on certain days, yes," but on other days there was not. He does not believe that his mother can provide food for him to keep him from being hungry.

Mack also does not believe Mother can provide a house free of lice and roaches. He was asked about issues with lice, and he stated that he shaved his head to avoid the lice, but that his sisters "had lice all the way up until we came back - - went back to [the foster home]."

Mack was asked his opinion of Father, and he stated: "My mom could do better." Mack testified that he and Father do not get along and stated: "Me and him just don't see eye-to-eye on things."

Mack testified that he is turning 18 soon and that the foster parents have told him he may stay with them even after he turns 18. Mack would like to stay with the foster parents. He explained that they treat him well, feed him, have a clean house, and that he feels close to them.

Hannah testified that she is fourteen years old. Hannah stated that when the last trial home placement disrupted, the Children were having problems with lice and the house had roaches. Hannah was asked about the food situation, and she stated: "We had food but, like, it was very little." She was asked about a visit from the caseworkers, and she stated:

Well, whenever Stacy (phonetic) came, she came in the house and - - Stacy and Karen came in the house, and whenever they came in and they see a roach or something, they, like, back off or something. And then they'd go into the kitchen and look around. And they'd see like a couple crawling around on the floor and counters and the living room and everywhere.

Hannah testified that there were roaches in the oven. She was asked if there were a lot, and she stated: "Yeah." Hannah stated that she had seen roaches in the refrigerator and had seen food in the refrigerator that had roaches in it. She was asked if that was a common occurrence, and she stated: "Most of the time it wasn't because all of us have put it in like Tupperware or aluminum foil over the top."

Hannah was asked if she wanted to return to Mother, and she stated: "Kind of and kind of not." Hannah was asked if she thought things would change if she returned to Mother, and she stated: "I think it will for a little bit and then go back to the way it was."

Hannah testified that the foster parents take care of her and see that her needs for food, medical care, and schooling are taken care of. She stated that she is happy in the foster home. Hannah testified that she has not been back to Mother's and Father's home since the last trial home placement disrupted in September of 2016.

After trial, the Juvenile Court entered its detailed Order Terminating Parental Rights and Decree of Guardianship on June 28, 2017 terminating Mother's and Father's parental rights after finding and holding, *inter alia*, that DCS had proven by clear and convincing evidence that grounds existed for termination for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii); for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and for persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and that DCS had proven by clear and convincing evidence that it was in the Children's best interests to terminate Mother's and Father's parental rights. In its June 28, 2017 order, the Juvenile Court specifically found and held, *inter alia*:

The Respondent [Father] is the father of the two youngest children named in this Petition. The Respondent [Mother] is the mother of all five of the children and has been in a relationship with [Father] since January of 2010. Both [Father] and [Mother] were properly served and represented by counsel.

All five children were removed from the home of [Father] and [Mother] ("Respondents") in April of 2014 due to environmental neglect. The Respondents and Mr. [E.] stipulated to D&N on July 8, 2014. In May

28

of 2015, the children were given home passes with the Respondents, and a subsequent trial-home placement began in June of 2015. The trial-home placement was disrupted after a domestic incident at the home of the Respondents on July 22, 2015. DCS filed a Petition to Terminate Parental Rights ("Petition") on January 27, 2016.

After the parental rights of Respondents were not terminated in the First Hearing, the children were placed back into the home of Respondents in July of 2016 and a second trial-home placement ("THP") was disrupted shortly thereafter in September of 2016. The children were once again removed from the home of the Respondents. The reason for the second disruption was environmental neglect based on several observations, including inadequacy of food, infestation of food by roaches, infestation of the entire residence by roaches, animal fecal matter throughout the home and in the bed of at least two children, lice in the hair of all the children except one, bug bites on the legs and festering scalp wounds on two of the younger children, and inadequate supervision. The children were subsequently adjudicated dependent and neglected, and the termination petition ("Petition") was filed on January the 25th of 2017.

### FINDINGS OF FACT

The evidence has shown that at the time of the disruption the children had been routinely subjected to living conditions appalling to the sensibilities and wholly inappropriate for minor children. The food sources were inadequate in quantity and quality. The kitchen and the entirety of the home was infested by roaches. These roaches were found inside the cupboard, inside the refrigerator, inside the stove, on top of the oven, and were often flicked off the food the children were trying to eat. The two younger children would often fall asleep on a floor infested by roaches. However, this was a better alternative for the kids than sleeping in their bed, which contained both roaches and canine fecal matter and hair.

At the time of the disruption, the two youngest children suffered from severe bug bites, lice, and had festering sores on their scalp, and excepting the oldest child whose head was shaven, the older children were also infested with lice. Also at the time of disruption, there were piles of dog feces molded and stuck to the carpet of the home, a strong smell of urine reaching to the exterior of the home, dogs infested with fleas in the home, and cats moving in and out of the home.

Per the testimony of [Mother], roughly six days each week the Respondents would leave for work at 10 or 11 a.m. and return somewhere between 11 p.m. and 2 a.m. During this time the [oldest three of the Children] would be left either at school or at home alone, supposedly under the guiding hand of [Mack], the oldest child. However, as it turns out, Mack would often leave the home to get away from the dismal situation leaving his two younger siblings, ages 13 and 11, alone. Also, Amber would often leave the home as well and run willy-nilly all over the neighborhood and Hannah often had to fend for herself to try to find food and cook a meal, over and against the onslaught of roaches crawling over, in, and around all known food sources.

The [younger two of the Children], ages 4 and 3 at the time of the disruption, were being babysat by [Father's] mother, an elderly woman on oxygen who has a house filled with the smell of smoke and who needs help to merely arise from the couch. Testimony has shown that the [younger two of the Children] came home sometimes on the weekends. The children were often found to be disheveled, dirty, despondent and hungry.

Stacie Weaver, caseworker for Freewill Baptist Ministries testified that as of her last visit to the home of the Respondents in April of 2017, nearly 8 months after the disruption and removal of the children from the home of the Respondents, the home was still in a woeful condition: a smell of urine and feces remained overwhelming; trash and broken glass sat just outside the home; piles of clutter had been pushed up against the walls to open up walking space on the floor, dead bugs were lying along the floors, kitchen counter, tables and tv; and children's blankets were pulled back to reveal dead roaches, spiders and hairballs. [Mack] reported being called a "dick" by the Respondents and several other names which he would not repeat to Ms. Weaver. Hannah and Amber both reported being called a "bitch" by Respondents. The mother would regularly call the girls ugly names.

On the other hand, the children have spent the remainder of the last three years, excepting two failed trial-home visits, in the home of the pre-adoptive foster parent. Hannah has said her relationship with her foster parents is "a special kind of love" she has never felt before. None of the older children want to return home. Mack chooses not to go to visitation, and Hannah has chosen several times not to visit. [Father] has been enjoying visits with his two children since January, and the visits have gone reasonably well; however, after one recent visit his younger children were

reinfested with head lice. At this time, all five children are bonded with their foster parents, doing well in school, and are generally more happy than before.

A psychological assessment, the testimony of caseworkers, and the judgment of the Court is that the parents are unwilling to take ownership that they have a problem. Because neither parent is willing to recognize the problem, neither parent is willing to do what it takes to resolve the problem. Both Respondents were also found to testify in the alternative: even if there was a problem with their home, it would be the responsibility of the landlord to fix it.

The Court finds that the Respondents have lied to caseworkers regarding access to their home, and have failed to make their home open to unannounced visits. [Father] sarcastically invited caseworker to visit him at 3 a.m. in the morning, only to fail to provide a day for her to visit at said time. [Father] consistently lied to caseworkers concerning his expired driver[']s license. In sum, the Court found the testimony of the Respondents to generally be evasive and unreliable. For example, [Father] testified he was unsure why the trial-home visit was disrupted, unsure whether the kids have had lice issues since the First Hearing, unsure whether he was forbidden to see his children until he provided a lice-free medical note, and unsure whether pictures of his stove, microwave and cupboard are from his home.

Mother and Father appealed the termination of their parental rights to the Children.

**Discussion**

Although not stated exactly as such, Mother and Father raise four issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence was proven to terminate their parental rights for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii); 2) whether the Juvenile Court erred in finding that clear and convincing evidence was proven to terminate their parental rights for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); 3) whether the Juvenile Court erred in finding that clear and convincing evidence was proven to terminate their parental rights for persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and, 4) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it is in the Children's best interests for Mother's and Father's parental rights to be terminated.

31

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

(1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### *B. Standards of Appellate Review*

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on

---

[4] Tenn. Code Ann. § 36-1-113(i).

the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven to terminate parental rights for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii). Tennessee Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2017). As pertinent to the case now before us, Tenn. Code Ann. § 36-1-102(1)(A)(ii) provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

35

(ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2017).

In the case now before us with regard to this ground for termination, the Juvenile Court specifically found and held:

### Ground One: Abandonment — Failure to Provide a Suitable Home,

Conclusions of Law: Karen Hudson, Department of Children's Services ("DCS") caseworker attempted on multiple occasions to visit the home of the Respondents but was largely unsuccessful. Ms. Hudson was lied to by the Respondents as recently as May 17, 2017 regarding an opportunity to visit their home. Ms. Hudson provided a resource packet to the Respondents which provided them with a list of potential housing opportunities. To their credit, the Respondents have routinely sprayed the home for lice, and have called potential housing sources in an effort to find other and suitable housing, but to no effect. However, in the eyes of the Court, spraying a home for roaches and making some calls to find suitable

36

housing does not comprise reasonable efforts to provide a clean, safe, suitable home.

In light of the repeated emphasis of DCS caseworkers, service providers, and this Court regarding the necessity of establishing and maintaining a safe and clean home, the efforts of the Respondents are adjudged to be minimal, and while consistent, token. Reasonable efforts in this case would involve cleaning the home and keeping it clean and free of infestation and filth, keeping enough food in the home to feed all five children, and providing adequate supervision to all of the children. To the contrary, the Respondents have continued to reside in an inappropriate home filled with lice, fleas, dog and cat feces, with insufficient food stores, while turning the older kids loose to be supervised by their wits and any neighbor who might, perchance, take one in. The younger children have been subjected to lice, festering sores, and bug bites.

In spite of all the evidence to the contrary, and by their own testimony, Respondents believe their house is fit for the children, even though they have not made it readily available to inspection by DCS. DCS made reasonable efforts to help the parents, but the parents have not been cooperative. Parents have demonstrated such a lack of concern for their children that it appears unlikely they will ever be able to provide a suitable home for their children for any significant amount of time.

**By clear and convincing evidence, the requirements of Tenn. Code §§ 36-1-113(g)(1), 36-1-102(1)(A)(ii),, [sic] have been met for Abandonment for Failure to Provide a Suitable Home.**

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court. We find no error in the Juvenile Court's determination that grounds were proven by clear and convincing evidence to terminate Mother's and Father's parental rights to the Children for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii).

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven to terminate parental rights for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). As pertinent, Tenn. Code Ann. § 36-1-113(g)(2) provides:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (2017).

With regard to the ground of substantial noncompliance with the permanency plan, the Juvenile Court specifically found and held:

**Ground Two: Substantial Noncompliance with Permanency Plan,**

Conclusions of Law" [sic]  After the last removal, the Respondents were required. among other thing [sic], to removal [sic] all pets from the home, provide a lice-free medical statement, establish and maintain a safe and clean home, acquire stable transportation and income, and rid their home of insects and pets.  The Respondents have maintained stable employment, removed all pets but one, and have two cars for one driver.  [Father] still has a revoked license and is incapable of driving legally.  Several weeks after the last removal, the Respondents provided a lice-free medical statement.

Although complying with certain aspects of their permanency plan, Respondents have failed to comply with the most weighty and significant requirement - - if you will, the *sine qua non* of their responsibilities.  They have failed to maintain and establish a safe and clean home for their children, and they have failed to provide adequate supervision.  At the time of the removal, and as stated above, there were significant issues with lice, fleas, bug bites, festering scalp bites, roach infestation, and a significant lack of supervision.

This Court is tasked with considering both the degree of noncompliance and the weight assigned to each particular requirement. The Court concludes by clear and convincing evidence that the Respondents are in substantial noncompliance with the great weight of their permanency plan, which centered on and around the necessity of establishing a suitable home.

**By clear and convincing evidence, the requirements of Tenn. Code §§ 36-1-113(g)(2)„ [sic] have been met for Substantial Noncompliance with the Permanency Plan.**

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court. We find no error in the Juvenile Court's determination that grounds were proven by clear and convincing evidence to terminate Mother's and Father's parental rights to the Children for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven to terminate parental rights for persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). As pertinent, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (2017).

In the case now before us, the Juvenile Court made the following specific findings and holdings with regard to the ground of persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3):

### Ground Three: Persistence of Conditions

Conclusions of Law: The children have been removed from the home of Respondents for approximately 36 months, excepting two trial-home visits, the last of which ended in September of 2016. After grounds and best interests were not proven at the First Hearing the children were placed back in the home of the Respondents in July of 2016, and approximately two months later the children were removed for substantially the same reasons as were pled by DCS [in] their first Petition to Terminate,

39

i.e. environmental neglect as evidenced by insect infestations, lack of supervision, lack of food, etc.

Now, after nearly three years, and after promising to allow an inspection in the final child and family team meeting in May, the Respondents failed to allow their home to be inspected by DCS. At the last visit to the home in April of 2017, the house had been fumigated and was filled with dead roaches. However, this did not eradicate the problem, as caseworkers witnessed other roaches crawling throughout the home. Furthermore, during the same visit support services worker Stacie Weaver found the home to have an overwhelming foul odor, found trash and broken glass outside door of the home, found trash bags stacked inside the closets, and blankets of the children were pulled back to reveal dead roaches and spiders. Hairballs with dog feces were found in a bed, and at least 8 roach traps were laid along the kitchen counter. Lice have been a recurring problem.

The parents continue to have a work schedule which necessitates being away from their children in the evenings and until the early morning, and while stating they will change their work schedule it has yet to be done. The Court finds by clear and convincing evidence that the conditions which led to removal persist, that there is little likelihood that these conditions will be remedied at an early date, and that the continuation of the parent and child relationship will greatly diminish the chances of the children integrating into a suitable and permanent home.

**By clear and convincing evidence, the requirements of Tenn. Code §§ 36-1-113(g)(3),, [sic] have been met for Persistence of Conditions.**

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court. We find no error in the Juvenile Court's determination that grounds were proven by clear and convincing evidence to terminate Mother's and Father's parental rights to the Children for persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it is in the Children's best interests for Mother's and Father's parental rights to be terminated. With regard to making a determination concerning a child's best interests, our Supreme Court recently instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

41

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In making its best interests analysis, in its June 28, 2017 order, the Juvenile Court specifically found and held:

### Best Interest

The minor children have been in the home of the foster parents for the greater part of three years. The children and the foster parents have stable, loving, nurturing, and fulfilling relationships. The older children are doing well in school, and are generally more confident, more active in extracurricular activities, and healthy. In short, the children are flowering away from the Respondents.

On the other hand, while maintaining visits with the children, Respondents have failed to make an adjustment of circumstances, conduct or conditions as to make it safe and in the best interests of the children that they ever return to the home of the Respondents. Reasonable efforts, encouragement, imploring and services have been provided to Respondents, but they continue to live in filth and infestation. In the eyes of the Court, this cannot be reasonably be [sic] expected to permanently change.

In conclusion, it would be a great detriment to the children to change their environment at this point in their lives. They are happily bonded and thriving. The children need security, stability, and permanency, and Respondents are simply unwilling to do what it takes to provide these core needs. By clear and convincing evidence, this Court finds that it is in the best interests of their respective children that the parental rights of [Father] and [Mother] are forever severed.

**By clear and convincing evidence, and pursuant to Tenn. Code § 36-1-113(i), the Court finds that it is in the best interest of the children to terminate the parental rights of [Father] and [Mother].**

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court. Furthermore, we find no error in the Juvenile Court's determination that the combined weight of the factors presents clear and convincing evidence that it is in the Children's best interests for Mother's and Father's parental rights to be terminated.

As grounds for terminating Mother's and Father's parental rights to the Children were proven by clear and convincing evidence and it was proven by clear and convincing evidence that the termination of Mother's and Father's parental rights to the Children is in the best interests of the Children, we affirm the Juvenile Court's June 28, 2017 order terminating Mother's and Father's parental rights to the Children.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellants, Barbara E. and Donald B.

_____
D. MICHAEL SWINEY, CHIEF JUDGE